Case number 141712, Scott Lee Rudlaff v. Brandon Gillispie et al. Or argument not to exceed 15 minutes per side. Counsel Marcellin Stepanski for the appellants. Good morning, your honor. May it please the court, Marcy Stepanski on behalf of the defendant's appellants, deputies Gillispie and Bielski. I'd like to reserve five minutes for rebuttal if I may. You may. Please proceed. Thank you, your honor. In this case, we're appealing the denial of qualified immunity and summary judgment from Judge Neff in the district court below. This is a case where Deputy Gillispie stopped the plaintiff on the side of M55 for driving with a license suspended. Deputy Gillispie knew that the plaintiff did not have a valid driver's license. It had been suspended for years due to some DUI convictions. and pulled him over and asked him to exit the vehicle. The plaintiff responded by being very agitated and swearing at the deputy. We're fortunate in this case to have audio and video evidence of the incident. The plaintiff exited the vehicle. Deputy Gillispie asked him to turn around so he could handcuff him. He told him he was under arrest. Plaintiff admitted this. The plaintiff refused to turn around. Deputy Gillispie attempted to turn him around. The plaintiff responded by taking a threatening posture and swinging his arm back. At that point, Deputy Gillispie continued to try to physically turn him around. Plaintiff then grabbed the side of the pickup truck he was in and refused to be handcuffed. Plaintiff expressly admitted all of this in his deposition. He said he knew he was under arrest. He said he knew the deputy was trying to handcuff him. And he admitted, yes, I tried to prevent him. He claims that he did that because he thought that the deputy sort of jerked him out of the truck and he didn't think that was right. That's blatantly refuted by the video evidence in the case. At this point, Deputy Gillispie repeatedly said, give me your hands, give me your hands. Deputy Bielski appears on the scene at this point as well, and that's captured on his audio recording. Deputy Bielski gets out of the car and expressly warns the plaintiff, if you don't comply, relax, or I'm going to tase you. The plaintiff is still unrelenting, and he admitted that he heard the warning. He just said, I don't pay attention to that. At that point, Deputy Bielski tased him one time, and at that point the plaintiff was secured and subdued. It's undisputed that there was no force used after they had Mr. Carpenter secured. And applying the Graham factors to this case, while driving with a license suspended may not be considered a severe crime, his behavior certainly did pose a danger to the safety of the officers as well as himself. What danger did it pose to the safety of the officers? Did he take a swing at the officers? Well, he took a threatening posture and he swung his arm back. What does that mean, he took a threatening posture? On the video, it shows that he, when the deputy tried to turn him around, he like, you know, it's captured on the video, but to describe it, he sort of puffed up his chest and turned toward the officer and swung his arm down and looked at him like with an angry demeanor. But the danger that was posed was not so much that, Your Honor. It was the fact that they were on the side of a two-lane highway on a narrow shoulder, and the plaintiff was known to be a flight risk. He had fled on foot before. Well, that may be the case, but in this instance, the officer was going in the opposite direction. He turned around, activated his blue lights, and I think the officer admitted that Mr. Carpenter, is that his name? Yes. Stopped. Yes. The officer ordered him out of the truck. He got out. Now, you said that they were swearing words, but he got out of the truck. He put his hands on the truck. Not immediately. He eventually did. You say not immediately, but in looking at the video, from the time the officer approached the side of the truck until the time he was tased, according to the videotape, lasted 26 seconds. Correct, Your Honor. And so when we're talking about not immediately, this whole encounter was so very brief. I'm not sure how you're getting some of this out of there. Well, this is why, because this is not the typical traffic stop where someone maybe doesn't have a record, they don't know each other, they don't know why they're stopped. Plaintiff admitted that he knew Deputy Gillespie, that when he saw him he knew he was going to get pulled over. Knowing that he still stopped. Yep, he stopped. He did stop. But then he still appeared to be weighing his options. He knew he was under arrest. He knew he was told to turn around. He knew that the deputy was trying to handcuff him, and he admitted he was trying to prevent it. And he said, I would have put my hands back there had he just allowed me to do whatever, but he didn't want to be officer handled or man handled. Didn't he say that? I understand that officers want everybody to be really compliant, but not everybody is going to be like Otis Taylor on Andy Griffith and just kind of come in and go right on in there and comply. Sure, I understand that, Your Honor. So the kind of force and the kind of things that you're inferring from this video aren't those the kind of things that the fact finder needs to kind of look at and make an assessment? I don't think so, Your Honor, and this is why. I think there was such knowledge and history here that's supported by the record that plaintiff knew the procedure he had been arrested so many times and the fact that he was stalling. He had been a flight risk before. He had fled from Officer Gillespie before. Officer Gillespie knew that he had had a prior altercation with a state trooper. And they're on a narrow shoulder of a two-lane highway with cars speeding by. In a perfect world, they could have had plenty of time to have a conversation, have him turn around at his leisure, but this is on the side of a highway. And when he shows that he's not going to be compliant, I think that the deputy has the right. I don't think there's any clearly established case law suggesting anything to the contrary, that he would have to give him more time, that he would have to allow him to do this at his leisure in order to accommodate the plaintiff. I mean, he had warned him. He had asked him repeatedly to give him his hands. He even employed a knee strike before they deployed the taser. And the plaintiff just admitted that he was preventing him, trying to prevent him from doing it. You mentioned that there had been a verbal exchange that Mr. Carbonell was cursing the officer. Yes. Is that on the videotape? Because I watched the videotape and I don't hear that. It's not because Deputy Gillespie's audio didn't work. That was testified to Deputy Gillespie and was not refuted by the plaintiff. And the audio picks up when Deputy Bielski pulled up, and it's very clear on the audio there where Deputy Bielski's yelling, give me your hands, give me your hands. And the plaintiff is gripping the side of the truck, refusing to do it. And then he employs a knee strike. The plaintiff's still on reliance. And then Deputy Bielski says, relax or you're going to get tased. And the plaintiff still will not release his hands. Isn't he tased? It seems to me that the tasing occurs almost simultaneously with the, give me your hands or you're going to be tased. And at that point it seems like he's deploying the taser. Well, I think that everything is happening so quickly. It's the typical Graham sort of scenario where Deputy Gillespie, Deputy Bielski arrives on the scene and sees Deputy Gillespie struggling with him, and that was a fact that was acknowledged by the court below, that the plaintiff was struggling with him. When you say struggling with him, again, words have power. And if I am listening to you and I haven't seen the videotape, there's a very different scenario conjured in the mind than what's actually on this tape. And so the struggling that you talk about occurring, a fact finder might look at that and not see struggle. Well, Your Honor, with respect to qualified immunity, the incident is supposed to be viewed from the officer's perspective. Absolutely. And there's supposed to be deference given to the officers for the fact that a lot of these incidents are sort of tense, rapidly evolving, occurring on the side of the highway. There's history between the two. And they can make mistakes in terms of like, well, should we give him more time, should we not give him more time? But unless there's something, some clearly established law indicating that they had to do the things that Your Honor is suggesting, then the officer should be given deference and entitled to qualified immunity for the force that, you know, the counter force, actually, that he was trying to employ to get the plaintiff to release his hands. This circuit has said that it's clearly established that you can't just engage in gratuitous use of the taser. And I think the question here is whether or not, under the totality of the facts and circumstances viewed from the officer's perspective at the moment of the arrest, whether or not this was appropriate force or excessive force in light of those circumstances. Well, I think that if he hadn't heard him say, if Deputy Bielski hadn't heard Deputy Gillespie say, give me your hands, give me your hands, hadn't seen him employ a knee strike to no avail, unsuccessfully, and then warn him, and the plaintiff admits he was warned and still didn't relent, and then tase him that that might be true. But we do have all of those other facts indicating that under the totality of the circumstances, I mean, I suppose they could have stood out there and argued with him longer, fought with him longer, but that's jeopardizing everyone's safety. Ms. Dubansky, one of the things that Judge Arnold is asking about is the short period of time from the relax, or I'm going to tase you, to the time that they actually tased him. And that does, from the video, look like it's a matter of only seconds. We get a number of cases dealing with qualified immunity and dealing with tasers, and oftentimes the question is, have you given somebody enough time to comply with whatever demand there is? So while it might be some cases where you could say they tased him too quickly here, which would be, I guess, an example of excessive force, it does seem to me that this is different in that Carpenter testified that he didn't pay attention to that warning. So what significance, if any, in this analysis, do we give to that statement in his deposition? Well, that he wasn't going to relent, for one, and in addition to that, there was nothing that the officers observed from him indicating that he was going to relent and comply. His physical demeanor, his actions in terms of the force that Deputy Gillespie had tried before the actual tasing, yelling at him, directing him, pulling his arms, trying to get him to, I mean, he's pulling on him and the plaintiff is using oppositional force. And then the deputy employs a knee strike and plaintiff still doesn't relent, so then they say, look, let go or you're going to get tased, and he still doesn't do it. I don't know how much longer. I guess that's the type of thing that qualified immunity protects because I guess in the deputy's minds, confronted with the situation, they don't really know how much longer they should have given him. Should they have given him 5 seconds, 10 seconds? It was clear during the exchange that he wasn't going to comply, and like I said, there's history between Deputy Gillespie and the plaintiff. Thank you. You'll have your 5 minutes. Go ahead. One question, counsel. Following up on this question of what a reasonable and reasonably trained officer in the heat of the moment should know in one of these encounters, and I believe it's already been alluded to, certainly there's law in this circuit that gratuitous use of a taser is not warranted. However, to a reasonable and reasonably trained officer, if in the course of the encounter it is objectively reasonable that you have reached a point where the suspect is, quote, resisting arrest, in all these terms, you know, does a reasonable and reasonably trained officer believe that use of a taser is appropriate if the suspect is, quote, resisting arrest? Absolutely, Your Honor, and this circuit has held in Cockrell and Higgins that when a suspect actively resists arrest, that using a taser is appropriate. This court has drawn the line between when a subject is resisting or when a subject is compliant or not doing anything, sort of like dead weight. But in this case, he was definitely actively resisting. He admitted it. He said, I held on. I knew he was trying to handcuff me, and I heard him tell me that he was going to tase me, and I didn't pay any attention to it. I don't know what else. So with that body of law, the only way that we could deny the officer qualified immunity is to find there was no, quote, resisting arrest, whatever that is. I would say so, but we don't even have to go that far here because they did try other methods. Deputy Gillespie did try other methods to gain control over the subject, and they just weren't successful. All right. Thank you. Thank you. Good morning, Your Honors. Dave Blake on behalf of the appellee, Mr. Rudloff. The district court did not err when it denied these defendants qualified immunity, and as set forth in our papers, we believe that a qualified immunity analysis such as what Judge Neff found at the district court level, turning on evidentiary issues does not even provide appellate jurisdiction here. But with that being said, I think Judge Donald was correct in her analysis that words do have power here. And if you look at the record evidence here, we have Defendant Gillespie testifying that my client was not actively resisting. He did exit the vehicle. He was attempting to comply with the commands at the time that the taser was deployed. And furthermore, if you look at Bielski's deposition testimony. Wait a minute. You're saying that Gillespie says he was not resisting arrest? Yes, that's correct. Where does he say that? He says that in his deposition. I don't have the site, Your Honor, but he did testify in deposition that the plaintiff put both hands on the truck as I requested.  He eventually got him to put his hands on the truck. I understand you can draw an inference from what Gillespie said, but there's no record evidence that says Gillespie says he wasn't resisting arrest. Well, I guess, Your Honor, I should clarify that. So let's go back to what people really do say. Do you agree with the exchange that Judge Matisse and your opposing counsel were having that our case law establishes pretty clearly that if you're actively resisting arrest, then force can be applied? Yes, Your Honor, but there was no active resistance here. Wait a minute. Where we go back to Judge Donald saying words have force and words have meaning, I think we would all agree to that. Your client says in his deposition, it seems to me, two very important things that I'd like you to address. One is that he admits that he describes it as balling up when Gillespie's trying to apply his cuffs because he didn't like him tugging on him, and if he had just let him do it himself, he would have complied. So is that not at least the first step in actively disagreeing with the commands that the police are giving you? Your Honor, I don't believe that that resistance, the actions do not warrant a taser. Well, that may be true. So I'm just going to take you through what your client says. First, he admits that he was not complying with the commands to do what the officer thought was necessary to get his arms behind his back and get his cuffs on. Is that a fair statement? He testified to that effect, Your Honor. Yes, he did. All right. And then he also testified in his deposition that when he was told he was going to get tased that he didn't pay any attention to that warning. There's no dispute about that, is there? Well, Your Honor, I do take an issue with that because, again, Defendant Bileski testified in his deposition that at no point in time did he warn that he was going to discharge his taser, and that's in his deposition, and that was also corroborated by Defendant Gillespie. There was no command or nothing to the effect that he was going to discharge the taser prior to discharging it. Bileski testified that he yelled out, or else you're going to get tased, and that's corroborated by the Bileski dash video cam. We can hear it ourselves. Okay. Well, the deposition testimony was based on what Bileski testified in deposition. He said that he never said anything prior to deploying the taser. Do you have a cite to that? Yes, Your Honor. That was DEP ID section 16428-3. 16428-3? Yes. Okay. And then the last thing that I wanted to ask you about is that, at least as I read it, your client admitted that at his deposition that he actually tried to prevent Gillespie from handcuffing him. Is there any dispute about that? Well, Your Honor, I think if you look in the totality of the circumstances. I'm just talking about what he said. We're back to words have power. That's what he said, isn't it? Yes, Your Honor. So here's the question. If he admits that he was attempting to avoid being handcuffed, which I would suggest means actively resisting arrest, then we can talk about the degree of force employed. I get that. But how can you say that the officers were not entitled to employ force, given the very words that your client says in his deposition? Well, Your Honor, I think that you look at the level of resistance here. You look at the case law is quite clear as to the crime that's afoot. Here we have a driving on a license suspended. The evidence shows that my client pulled over, exited the vehicle, was attempting. There was some discussion with the officers. He was attempting to comply with their commands. Yes, he admitted that he had balled up and that there was a low-level de minimis type resistance here. This was not active forceful resistance. He never struck anyone. But, counsel, let me ask you this. Let me go back. Certainly, words have power. But I do wonder how the words that we write up here on the bench with all these encounters, how a well-trained, responsible, conscientious police officer on the street is supposed to do it. Going back to the exchange I had with your opponent, would you disagree with me that, at least in this circuit, a reasonably well-trained police officer on the street would believe that if a suspect engages in, I'm going to use the term of art, quote, resisting arrest, that it is objectively reasonable for that officer to tase that suspect? Forget about proportionality, you know, and so forth. I mean, you know, because this court, I believe, has said that. Now, that may or may not be good public policy. But, again, looking at the perspective of a reasonable, reasonably trained police officer, is that not what a reasonable, reasonably trained police officer would think? Look, resisting arrest at whatever level, I can tase them. Well, no, Your Honor. It's not. I do agree with you that the Sixth Circuit has addressed those issues. But I think if you look here, in this quickly evolving situation, you have, at best, my client balling up. There's no real active resistance. I do understand that a reasonable officer may feel that they have the ability and the right to use a taser. But, I mean, but if they do, if they do, that's the end of the inquiry for qualified immunity, right? I mean, that's, we don't ask any more questions. Yes, but you look at, I think you have to look at the situation as it's presented here, Your Honor. That's kind of the situation that Judge Neff was evaluating when she tried to describe what the clearly established law was. She says this case does not fall neatly into categories of clearly established taser law. And that's pretty much what you're saying right now, isn't it? That's correct. Okay, you can, if somebody resists arrest, the police can employ force. But, gee, we need to look at the amount of resistance and the type of crime and determine whether this force in this instance is reasonable or unreasonable, right? Yes, Your Honor. So if we don't have any cases, as Judge Neff, at least, believes to be the case, then how can the law be clearly established? Well, Your Honor, if you look here again, you have the video, you have the portions of the audio, you have the deposition testimony that there was not any warning. You have a compliant person who's out of his vehicle. The evidence shows that he had his hands on the truck at the time. Stop right there for just a second. Your client's position is he wasn't compliant from the very beginning. Your client's position is that he had to be jerked out of the truck to even get out of the truck. So you can't have us believe him. You can't ask us to believe him on some things and then not believe what he says was the whole beginning of this incident. Yes, Your Honor, just to clarify, it wasn't his position that he had to be jerked out of the truck. It was his position that he was jerked out of the truck by the defendants here. But if you look at the use of the taser as applied to these factors, it was objectively unreasonable. And where is there a case that addresses these facts? Well, you look at the cases that we cited in our brief. Which one is the best case, do you think, for establishing the proposition that the police have to make this split-second judgment as to the degree of resistance, given that he's admitted he had some resistance here, before they can use force? Well, if you look at the Parker v. Garish case, Judge, and then there's a whole line of cases that talk and address dramatic movements, any sort of violence, striking any of the officers. And here, again... We also have cases that just say if you're laying on the ground and you put your hands underneath and you won't let go of your hands to put them behind your back, that's enough to tase somebody, right? Right, but that's not applicable here. Well, I understand. So Parker is the one that is your best case? Yes, sir. All right, thank you. Counsel, once again, and I mean, I hate to... I mean, is the law that we're asking police officers out on the street to have this encyclopedic knowledge of all the resisting arrest cases this court's handed down and all the different facts? I mean, again, the test for qualified immunity is what a reasonably objective... That's correct, Your Honor. Let's even add another term that I haven't seen the law. Conscientious police officer would do in the heat of the moment, right? And I mean, what do you think a police officer should do? I agree with the case law, Your Honor, and I know what the Sixth Circuit says regarding a reasonable belief and an officer faced with that split-second decision. But what you have here is you have a history with this particular plaintiff and the defendants. They know that he doesn't have any sort of violent history. You look at it again. He's out of the vehicle. Maybe he's balling up his fists. I think that he got in a scuffle with the state police. I don't believe that to be the case, but... Well, that's what the record seems to show. I'm not sure that the record tells us what the actual scuffle was. You don't think that occurred at all? I don't believe. I wasn't aware of that, Your Honor. But back to Judge Matisse, your question, you look at the circumstances as being reasonable as applied to these particular facts. And I think when you have a person who is out of his vehicle with his hands on the truck, it's not reasonable to tase him at that point with no warning, and that's our position. If Parker's your best case, your opposing counsel responds in the reply brief by pointing out, number one, it's a First Circuit case, not a Sixth Circuit case, but then goes on to say that one of the distinguishing factors in Parker is that the plaintiff testified he was confused by the instructions that were shouted at him. So, in other words, he didn't know what he was supposed to do. Assuming that that's a correct characterization of Parker, is there anything similar to that that occurred in this case? Well, no, Your Honor. Just that the evidence shows that he was attempting to comply after the initial confrontation with the officers, and at that point he was tased with no warning. Okay. Good job. No, no. All right, thank you. Counsel? Thank you. Just briefly, Your Honor, I would first like to address the matter of appellate jurisdiction. Despite the judge not found a disputed factor that the record might need clarification, a district court's decision doesn't dictate appellate jurisdiction. That's the Chapel case. In terms of whether plaintiff was attempting to comply, if he would have just been given more time, Deputy Gillespie can't read the plaintiff's mind. He doesn't know that if he had given him more time, he would have complied. All he knows is what he's encountering at that moment, and the court's required to look at it from the officer's perspective and see that plaintiff just simply is not complying. Third, Deputy Bielski did testify. There certainly could be a case, I suppose, where a defendant could have said, hey, wait a minute, man, let me do this on my own, or give me time, or don't jerk my arm, I'll do it myself. Is there any evidence of anything like that having been communicated to the officers here? Nothing like that here, Your Honor. And Deputy Bielski, who's the second officer who arrived on the scene, who's the one who tased the plaintiff, when he arrives, he sees Deputy Gillespie struggling with him. So his knowledge of what's occurring is what he sees before him, where he's trying to get the plaintiff handcuffed, the plaintiff is hanging on to the back of the truck, refusing. He sees Deputy Gillespie give him a knee strike, yell for him to release his hands, and that the plaintiff's not complying, and then he warns him, and then he does tase him. Now, Deputy Bielski did not remember initially having warned the plaintiff, but the plaintiff admitted that he heard it, and we all know that it is on the audio evidence. So although he was mistaken in his testimony that he doesn't recall having warned him. Well, Mr. Blake says he testified he didn't give him a warning. That he may even have said, I didn't warn him. But the bottom line is, on the audio, we can very clearly hear him warn him. And Scott v. Harris, the Supreme Court has said, if you have audio or video evidence that sets the record straight, that the court relies on that. But is there any requirement that you warn someone before you tase them, or is the decision to tase based on the conduct that's going on in the grant? Absolutely, it depends on the circumstances, Your Honor, because there may not be time to warn somebody before you tase them. But in this case, we know that he did because it is on the audio, and the plaintiff admitted that he heard it, and he just didn't listen to it. Well, it seems to me that there are some different characterizations of what happened. I understand that Mr. Carpenter did admit that he was engaged, that he did resist. But as I said before, the case all says this has to be evaluated in the light of the total facts and circumstances, and from the standpoint of a reasonable officer. So why isn't the degree of force used here, and whether or not it's reasonable, why isn't that a question for the jury to determine upon hearing all of this? Because, Your Honor, with respect to qualified immunity, there's no clearly established law that would suggest that under these circumstances, when they have tried lesser means to get him to comply, and there's no indication that the plaintiff is going to comply, and they're on the side of the road, they know plaintiff is a flight risk, he's fled on foot before. The record also establishes that he's had a physical altercation with a state trooper before, and he can be volatile. Well, you're saying that, but I don't believe that the officer who was the arresting officer, I don't believe that he said he had knowledge of that, did he? Well, Deputy Gillespie absolutely testified to that. But he had knowledge that he'd gotten into a scuffle with a state officer? Yes, absolutely. Well, Judge Neff finds that the force here, and whether it was gratuitous or not, that there was enough here for this to be a jury question. But you're saying that she's just wrong, and because of these things you're telling us now, that's what makes her wrong? I am, I am, Your Honor. And that's because I don't know how it could be concluded that this was gratuitous, because it wasn't like they, you know, it's not as if he appeared to be compliant. It's not as if they didn't try lesser intrusive means to get him to comply. They verbally directed him. He pointed a couple times on the video. He then physically tried to turn him around. He then employed a knee strike. I mean, this is the furthest case, I think, from a gratuitous use of a taser. I mean, and then they warned him that I'll tase you if you don't do it, and he still hung on. Let me try this on you for just a second to see what you would respond to this. If there's a fact question, then we don't have jurisdiction. We all know that. So if we start from the proposition that everybody seems to enthusiastically or reluctantly agree to, that there was some resisting arrest, if then the question becomes was the amount of force reasonable in light of the amount of resistance, is that a fact question or is that a legal question? That's a legal question, Your Honor, and there has to be clearly established. So if that's a legal question, then what is there to submit to the jury in connection with qualified immunity? Because the whole idea of qualified immunity, of course, is you resolve these things up front because it's immunity from suit. Right. There isn't, Your Honor. This is a situation where there's case law that says that these officers were entitled to use the force that they used in this case. There's nothing to suggest that they weren't allowed to use it, and it is a legal question for this court to resolve. The plaintiff agrees. He admits, I held on. He told me I was under arrest. I knew he was trying to handcuff me. Did you try to prevent him from handcuffing you? Yes, I did. Did he warn you that he would tase you if you didn't comply? Yes, he did, and pay any attention to it. There was no indication from the officer's perspective that he was going to comply. And with cars speeding by, I mean, they wanted to get him secured. Counsel, let me finally put a blunter point on this, that you are probably too wise. I'm not too wise, but you're too wise to bring up. Following up on this line of questions, if there's a problem here in this encounter, the way it was handled, it's not the fault of the officer on the street. It's the fault of this court for not laying down clear enough and good enough rules that would permit police officers to conform to conduct. Is that another way, perhaps too blunt to put it? Well, I think that everything that the court has done definitely suggests that the force use was reasonable. The court has drawn the line between resistance and not. Isn't this sort of the classic Pearson case where if there isn't clearly established law, if this court chose to say, as a constitutional matter, this was excessive force, we could say that in this case, and then the law would become clearly established, but not as to this particular case. In the next case. That's right, but not as to this particular case. That's correct, Your Honor, and Pearson has said the court can take whatever factor they want to consider in whatever order, and this is a classic example where qualified immunity should apply here. All right, thank you. Thank you. That completes the arguments in this case. The case will be submitted. That's the last case.